# In the United States Court of Federal Claims

No. 21-1685C
(Filed:  September 4, 2024)

| | |
|---|---|
| **SERGENT'S MECHANICAL SYSTEMS, INC.,** | ) ) ) ) |
| *Plaintiff,* | ) ) |
| **v.** | ) ) |
| **THE UNITED STATES,** | ) ) ) |
| *Defendant.* | ) ) ) |

*Joshua Sather*, Whitcomb, Selinsky, P.C., Denver, CO, for Plaintiff.

*Matthew J. Carhart*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.  With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Deborah A. Bynum*, Assistant Director.  Also on the briefs were *Kathleen Ramos*, Staff Attorney, Office of General Counsel, Department of Veterans Affairs.

## OPINION AND ORDER

*SOLOMSON*, **Judge.**

Plaintiff, Sergent's Mechanical Systems, Inc. ("Sergent"), had a building-repair contract with Defendant, the United States, acting by and through the Department of Veterans Affairs ("VA").  The government terminated the contract for default.  Sergent sued the government pursuant to the Contract Disputes Act ("CDA"), asserting that any default should be excused due to various government actions and directives that interfered with Sergent's performance.  The government counters that Sergent's performance was materially deficient and incurably far behind schedule, in violation of the contract, and thus the government properly terminated Sergent for default.  The material facts are not in dispute and the parties properly have cross-moved for summary judgment.  The case turns on the interpretation of the contractual terms at issue — a question of law.

As explained below, the Court finds that Sergent's default for failure to make progress was inexcusable.  In essence, Sergent engaged in anticipatory repudiation,

telling the government that Sergent would be unable to complete its work on time due to what the undisputed facts demonstrate were its own shortcomings in performance. Furthermore, the government is entitled to summary judgment on Sergent's claim for additional costs because Sergent had the contractual responsibility to deal with the particular obstacles and work that form the basis of Sergent's claim.

I.     **Factual Background[1]**

On or about June 30, 2020, the VA contracted with Sergent for repairs at the C.W. Bill Young Medical Center in Bay Pines, FL.  ECF No. 51-1 ("Pl. App'x") at 5.[2]  Per the contract, the government promised to pay Sergent $3,889,875.46 for "resolv[ing] certain heating, ventilation, and air conditioning ('HVAC') issues" at the hospital.  ECF No. 12 ("Compl.") ¶ 15.  On August 18, 2020, the VA issued a Notice to Proceed to Sergent with a completion date of August 17, 2021.  Pl. App'x at 1073.[3]  Three complications arose soon thereafter, which ultimately resulted in the government's terminating the contract for default, and, ultimately, this litigation.

A.  Cooling Coils

The contract included work the contractor would have to do to replace cooling coils in air conditioning units ("ACUs").  *See* Pl. App'x at 885-87, 1056-57.  One contract specification required Sergent to "[f]ield measure existing cooling coils in existing air handling units and provide replacement coils with the scheduled performance and specified construction" and directed Sergent to "[r]efer to Drawings and Section 23 82 16, AIR COILS for additional coil requirements."  *Id.* at 885-86.  Another specification required those cooling coils (also referred to as tubes, or cooling-coil tubes) to be a minimum diameter of 5/8 of an inch.  *Id.* at 1056.  Finally, an addendum to the specifications, entitled "COIL PERFORMANCE DATA (IF APPLICABLE)" featured data sheets from June 2009 with information on the ACUs in use prior to the construction effort at issue in this case.  *Id.* at 963-1053.  The specification with the more general instructions regarding cooling-coil replacement also required Sergent to furnish submittals "for all air handling units covered in the project" including information regarding "[c]ooling coil

---

[1] The facts contained in this section are undisputed.

[2] Both parties submitted appendices to their motions for summary judgment.  *See* ECF Nos. 51-52.  Throughout this opinion, the Court generally cites to Sergent's appendix.  The page numbers for citations to both appendices refer to the automatically generated ECF page numbers in the top-right corner of each page of the PDF document.  Page numbers for citations to the parties' briefs, however, refer to the party-generated numbers on the bottom of each page.

[3] Sergent's complaint lists the scheduled completion date as "August 16, 2020."  Compl. ¶ 19.  The Court understands that the year noted in the complaint is a typographical error.  Moreover, none of the parties' arguments turn on whether the precise completion date is August 16 or 17, 2021.

construction details and performance data" and "[e]xisting air handling unit manufacturers recommended procedure for cooling coil replacement." *Id.* at 885-86. It further warned that "[p]artial and incomplete submissions shall be rejected without reviews." *Id.* at 885.

On August 18, 2020, Sergent submitted for VA approval a proposed purchase of at least "some" half-inch diameter cooling coils for ACU repairs pursuant to "specification section and paragraph [number] 23 82 16-1/1.4[.]" *Id.* at 1077-78. On August 20, 2020, the VA rejected Sergent's initial submittal, on the basis that the half-inch diameter coils were the wrong size. *Id.* at 1076. Sergent responded later that same day with a Request for Information ("RFI") concerning the disapproval. *Id.* at 1074. In the RFI, Sergent's project manager noted:

> Section 23 73 00 has the exact coil requirements coil by coil. . . . Section 23 82 16 somewhat contradicts Section 23 73 00 in that i[t] seems to state the tubes must be 5/8" only. We really need to stick with the Section 23 73 00 Coil Data sheet requirements so we can provide exact coil replacements as is the intent of the contract so the coils will fit in the existing air handlers. Please allow 1/2" as per the attached Section 23 73 00 Coil Performance Data Sheets.

*Id.*

On August 24, 2020, Sergent transmitted yet another submittal to the VA for review, addressing the "Review Comments from [the] original submittal," revising the field dimensions of the coils to, and listing all proposed coils to be installed as, 5/8 of an inch. Pl. App'x at 1081. Before receiving a response to its second submittal, Sergent submitted a second RFI on August 28, 2020, reiterating that

> [t]here seems to be a discrepancy between the cooling coils . . . specified in Section 23 73 00 and those called for on sheet M601 Air Handling Unit Schedule. Our coil [supplier] . . . and Sergents have provided coil submittals that conform to section 23 73 00. However, we assume that our [submittal] has been disapproved based on the capacities listed on plan M601. Unfortunately . . . , the specifications and plans conflict with each other. The plans require coils with increase[d] capacity over what is required by the specifications. In order to achieve the increasing capacities, the coils must be changed resulting in the use of more copper at a substantial cost increase. It is my understanding that the specifications override the plans. Attached are the reviewed

3

> coil submittal, Specification Section 23 73 00, and
> M601.  Please advise if you like us to provide the cooling
> [coils] per the specification or the plans.  This information is
> urgent if we are to meet the October start date for the coil
> replacements required by the contract.

*Id.* at 1083.  A representative of the VA's contracting officer replied on September 1, to
clarify how to read the contract:

> The required coils and their . . . performance requirements
> are scheduled on the drawings dated November 2, 2018.  The
> information [Sergent] considered to be conflicting (coil data
> sheets) is not part of section 23 73 00, due to it being placed
> after the end of the spec[ifications] section.  Section 23 73 00
> says to provide coils with "scheduled" performance and does
> not refer to the coil data sheets.

*Id.* at 1084.

On August 25, 2020, Sergent's second submittal was disapproved for several
reasons, all of which were seemingly unrelated to those in the first submittal's
disapproval.  Pl. App'x at 1079-80.  On September 3, 2020, Sergent transmitted to the VA
"Submittal #23 92 16-2.1 – Revised Cooling Coils per the VA Direction," *id.* at 1085-86,
which the VA designated "REVIEWED EXCEPTIONS NOTED"[4] on September 9, 2020.
*Id.* at 1087-88.  In explaining the VA's exceptions, the the VA's engineering consultant
summarized Sergent's perceived discrepancies between different contract specifications:

> The transmittal states that this submittal contains coils with
> increased capacity above and beyond what is in the contract
> documents and that this was done per directions by the VA.
> The VA has told us that they did not direct the Contractor to
> size the coils with increase[d] capacity, therefore, this review
> is based on the scheduled capacities in the contract
> documents.

*Id.*

---

[4] "REVIEWED EXCEPTIONS NOTED" does not indicate disapproval of the submittal.  Rather,
items marked as such "do not need to be resubmitted.  It is the responsibility of the manufacturer,
vendor, and contractor to ensure that items noted below are corrected and that products delivered
to site meet design intent and specifications.  Items delivered to site in violation of notes provided
below shall be condemned."  Pl. App'x at 1087.

Sergent submitted a Request for Equitable Adjustment ("REA") to the government on September 9, 2020, seeking $88,841.29 in extra compensation and a 60-day extension for the project because of what Sergent called the "discrepancy regarding the 56 replacement cooling coil requirements between the drawings and the specifications." Pl. App'x at 1092.  Specifically, Sergent argued that the VA's responses to Sergent's submittals caused the increased costs because the VA told Sergent not to use specification Section 23 73 00 even though that section contained what appeared to be "detailed schedule information for the replacement cooling coils for each ACU" described "in very fine detail."  *Id.* at 1092-93.

On September 17, 2020, the VA denied the REA.  *See* Pl. App'x at 1454-57.  In doing so, the VA's contracting officer emphasized that specification section 23 73 00, which Sergent identified as a source of confusion, included language directing Sergent to the specifications containing information on required coil size.  *Id.* at 1455.  He further criticized Sergent for misinterpreting extra-contractual information related to the coils as an improper attempt to modify the contract's plain language.  *See id.* at 1456-57 ("The information from Coil Manufacturer is irrelevant to this REA. As stated in the quote it was provided 7/24/2020, twenty-four days after contract award. This quote and subsequent misinterpretation on the contract has no bearing on the contract price as accepted on 6/30/2020. . . . The inclusion of referenced contract clauses not contained within in our contract and used in your REA presents an ill-considered approach to your REA submission.").

On September 21, 2020, the VA approved Sergent's September 3, 2020, submittal, which incorporated the 5/8-inch diameter tubes and higher-capacity coils.  Pl. App'x at 1085-86.

B.  Asbestos

The contract required Sergent to "remove all asbestos containing and asbestos contaminated materials indicated in these general notes, specifications, and as shown on drawings, and dispose of as asbestos waste."  Pl. App'x at 131.  Sergent also was "responsible for field verifying the existing quantities and conditions of asbestos containing and asbestos contaminated materials[.]"  *Id.*  On October 15, 2020,[5] Sergent inquired with the VA regarding the location of asbestos-containing materials ("ACM") at the Bay Pines Facility, and the VA allegedly responded that it "did not know the location

---

[5] Sergent's complaint describes several facts related to asbestos-containing materials as occurring in October-November 2021. *See* Compl. ¶¶ 56-59.  These appear to be typographical errors, as the events described correspond to appendix documents from 2020.  This Opinion and Order uses corrected dates throughout.  The parties do not dispute the dates on which these events occurred.

of ACM." Compl. ¶¶ 56-57.[6] Subsequently, on October 30, 2020, Sergent submitted an RFI, asking, "Can you please tell us exactly where the 20 plus or minus elbows are located[?] It is typical and within the normal standard of care to provide [abatement] plans that provide exact locations and quantities." Pl. App'x at 1460.

On November 12, 2020, the VA's lead general engineer sent several separate messages responding to the RFI. The first indicated: "Each area of work will be evaluated with a pre-construction risk assessment before commencement of work activities in that area. Areas will be evaluated for the presence of asbestos at that time." Pl. App'x at 1461. Then, 15 minutes later, the engineer wrote: "As per spec[ification] section 02 82 11, 1.1.1, any quantities of asbestos to be abated different than what is stated in the contract documents will be brought to the attention of the Contracting Officer for resolution." *Id.* Sergent's project manager followed up with the VA later that same day, asking if it would be "the VA performing these 'pre-construction [risk] assessment[s]'" and noting that he "would like to have all the Mechanical rooms abated continuously until all the elbows are abated." *Id.*

On November 18, 2020, Sergent acknowledged that "[a]s per the 11.13.20 Project Meeting, the VA directed [Sergent] to get a proposal to perform a[n] asbestos site survey and testing to determine exactly where the Asbestos is located." *Id.* at 1461.[7] Contrary to the government's direction, Sergent did not produce such a survey. Instead, the VA commissioned its own ACM survey from OHC Environmental Engineering, Inc. ("OHC"), culminating in a December 8, 2020, report ("the First OHC Report"), which was provided to Sergent on December 11, 2020. Pl. App'x at 1468-1516. Subsequently, on December 22, 2020, Sergent submitted a proposal for ACM remediation based on the First OHC Report's findings, with a breakdown of estimated costs. *Id.* at 1578. Finally, on January 5, 2021, the VA commissioned a second report from OHC, which it provided to the VA on January 14, 2021. Pl. App'x at 1580-1648.

Sergent alleges that "on multiple occasions, the VA declined Sergent's offer to remediate the ACM identified in the First OHC Report, assuring Sergent that the VA would abate the ACM with their own local abatement contractor(s)." Compl. ¶ 71; *see*

---

[6] Sergent's "Weekly Project Meeting – Agenda and Notes" document from October 15, 2020, does not reflect that the parties discussed the location of ACM or that the VA did not know where ACM was located. *See* Pl. App'x at 1458-59. The government does not dispute, however, that Sergent accurately represents what was discussed at the pertinent meeting. *See* Def. MSJ at 8 (citing to its own appendix, ECF No. 52-3 at 272-73, for project meeting agenda and notes). The Court does not regard any potential dispute over this fact as material, in any event.

[7] Sergent alleges that "in late November 2020, Sergent provided the VA with a proposal for an asbestos site survey and test," which the VA "verbally rejected." Compl. ¶¶ 63-64. The government neither disputes nor confirms this allegation. The Court finds it immaterial, given the legal analysis *infra*.

*also* ECF No. 51 ("Pl. MSJ") at 7 ("The VA . . . assured Sergent that the VA would abate ACM using its own abatement contractor.").

Sergent appears to have completed none of the asbestos-abatement work prior to its termination for default in March 2021.

C.  ACU Outages

The last source of alleged government-caused delay concerns limitations the government imposed on ACU outages.  Put simply, Sergent needed to turn off air conditioning services intermittently in order to install new cooling coils for ACU repairs.  However, the VA imposed restrictions on when and for how long Sergent could turn off air conditioning services during its work.  Sergent alleges these restrictions improperly impeded its work.  *See* Pl. MSJ at 32-33.

The parties do not dispute that outages are necessary and unavoidably occur "as part of the process of installing cooling coils."  ECF No. 52 ("Def. MSJ") at 31.  The parties further agree that, pursuant to the contract, Sergent had to seek the government's permission to turn off ACUs via "outage requests," and that the VA retained discretion to grant or decline the requests.  *Id.* at 33-34 (citing Sergent representative's deposition testimony regarding how VA hospitals handle outage requests); *see also* Pl. App'x at 503 ("Electrical work shall be accomplished with all affected circuits or equipment de-energized . . .  Contractor shall submit a request to interrupt any such services to [the contracting officer], in writing, 7 days in advance of proposed interruption.").

But the outages naturally had the negative effects of "[i]interrupting air conditioning," which "increased the temperature in occupied patient rooms, thereby affecting patient care."  Def. MSJ at 31 (citing depositions from Sergent and government officials).  The VA therefore "imposed limitations on when," and for how long, "these outages could occur."  *See id.; see also* Pl. App'x at 1779-80 (CO's supervisor explaining impetus for outage restrictions).  Moreover, the VA's "engineering staff . . . developed a procedure for replacing the cooling coils one air tunnel at a time which will not require cooling shutdowns in excess of two hours."  Pl. App'x at 1778.  Thus, on February 2, 2021, the VA informed Sergent that it would be limited to three hours of ACU outages at a time, with specific outages still requiring approval by the VA.  *Id.* at 1777.

Sergent complains that "[t]he 3-hour ACU outages the VA imposed precluded Sergent's ability to complete work on the ACUs within a single outage period, impeding Sergent's ability to make progress on this portion of the work."  Compl.  ¶ 41.  Moreover, Sergent contends that "[t]he VA's limitation of ACU outages to periods of no more than 3 hours was not contemplated in the Contract" and improperly "restricted Sergent's ability to complete the cooling coil replacement work by arbitrarily limiting the number of outages Sergent would be granted."  *Id.*  ¶¶ 42-43.

D.  Termination for Default

On February 19, 2021, the VA issued a cure notice to Sergent, informing it that the VA considered Sergent delinquent on its work, "not fully prepared to engage in additional work," and non-compliant on several workmanship and safety standards.  Pl. App'x at 1660-61.  Among the VA's concerns were Sergent's failure to begin cooling coil installation until January 8, 2021, "[i]nadequate quality standards," improper coil installation, and other "[s]afety concerns."  *Id.*  The VA directed Sergent to provide an "[u]pdated complete project schedule which clearly shows the project critical path, as well as a 3-week lookahead plan," "[d]ocumentation for all work completed," and sought assurances that Sergent would adhere to procedures and protocols.  *Id.* at 1661-62.

On February 26, 2021, Sergent responded to the government's cure notice with a "3 Week Look Ahead," and a litany of issues Sergent considered responsible for the delays.  Sergent blamed the delays on "contract ambiguities, errors, and omissions" and which "were not addressed by the VA . . . and have not been resolved as of today."  Pl. App'x at 1672.  Sergent also presented a new schedule that included a 192-day delay that it claimed the VA caused.  Pl. App'x at 1668-71.

On March 16, 2021, the VA issued Sergent a notice to show cause why the government should not terminate Sergent's contract for default.  Pl. App'x at 1682-84. The notice described how Sergent had "failed to cure" the defects in performance, including a coil-installation schedule that "still exceeds the contract specification requirements," ACU outage schedules that "caused the VA to [have to] intercede," and persistent "[u]napproved materials" onsite.  *Id.*

On March 22, 2021, Sergent requested a schedule deviation, which noted that "we may have to wait until October 2021 to fully replace all the cooling coils."  Pl. App'x at 1686.  On March 26, 2021, Sergent responded to the notice to show cause, Pl. App'x at 1689-1702, arguing that "Sergent is in compliance with the Contract's requirements, and any potential non-compliance (i.e., related to the delays Sergent has experienced on the project, to date) is due to the VA's own actions or inactions."  *Id.* at 1692.  Sergent once again presented a schedule, this time showing a completion date of December 9, 2021, or 114 days after the original completion date.  Def. App'x (Vol. II) at 507-09.[8]

Five days later, on March 31, 2021, the VA terminated Sergent's contract for default.  Pl. App'x at 1711.  At the time of termination, the VA had paid Sergent

---

[8] Though Sergent does not appear to have included in its appendix the schedule it submitted on March 26, 2021, Sergent's counsel acknowledged at oral argument that Sergent anticipated 114 days of delay as compared to the original required completion date.  *See* Tr. 7:23-8:1, 24:14-15.

$462,410.68, Compl. ¶ 88, with Sergent having invoiced another $533,154.78 yet to be paid. Pl. App'x at 1705.

On April 5, 2021, the VA sent a notice to Berkley Insurance Company, which was acting as Sergent's surety, requesting that Berkley "provide notice as to whether [Berkley] plans to provide a proposed surety takeover agreement[.]"  Pl. App'x at 1713-14.   On April 6, 2021, Berkley acknowledged receipt of the request, *id.* at 1750-51, and on July 29, 2021, Berkley instructed Sergent to be "on notice of an anticipated bond loss in relation to the termination of Sergent for default . . . that will trigger [Sergent's] obligations under the [General Agreement of Indemnity]." *Id.* at 1752-53.  Berkley demanded $2.81 million in collateral, *id.* at 1755, which Sergent paid.  *Id.* at 1757.  Berkley agreed to provide a substitute contractor to the government to complete the remaining work under the original contract for $6,237,953.95.   *Id.* at 1758.   On July 17, 2023, Berkley returned $214,413.94 of the $2.81 million collateral payment to Sergent.  *Id.* at 1770.

II.    **Procedural History**

On August 12, 2021, Sergent filed a complaint against the United States, pursuant to the CDA, 41 U.S.C. §§ 7101 *et seq.*  ECF No. 1.  On that same day, Sergent filed a Motion for a Temporary Restraining Order/Preliminary Injunction.   *See* ECF No. 6 at 18. Specifically, Sergent requested that

> this Court enjoin the VA from: (1) executing a completion contract for any remaining work under the terminated contract; (2) authorizing the performance of any work under any completion contract that has already been executed; and (3) noticing other federal procuring agencies, contracting officers, or other government officials of the contested termination for default . . . via the government's various evaluation reporting tools.

*Sergent's Mech. Sys., Inc. v. United States*, 157 Fed. Cl. 41, 45 (2021) (internal quotations and brackets omitted).

On August 19, 2021, the Court denied Sergent's motion, explaining "the plain language of §1491(a)(2) does not authorize this Court to issue injunctive relief in CDA cases, and particularly not preliminary injunctive relief." *Sergent's Mech. Sys., Inc. v. United States*, 155 Fed. Cl. 146, 148 (2021).[9]

---

[9] Further, the Court concluded that "[n]owhere in the complaint does Sergent contend that these allegations involve a challenge to a pending procurement or to a contract award sufficient to

On August 24, 2021, Sergent filed an amended complaint, "reiterating the same claims and the same jurisdictional basis for them (and reflecting apparently only minor corrections)." 157 Fed. Cl. at 45.   The amended complaint primarily seeks money damages, "as well as declaratory relief unrelated to [Sergent's] request for preliminary equitable relief." *Id.* (quoting Compl. at 19).

On August 27, 2021, Sergent filed a motion requesting certification of its denial of Sergent's motion for injunctive relief for an interlocutory appeal to the United States Court of Appeals for the Federal Circuit.   ECF No. 13-1.   The Court ruled that Sergent's motion for certification was unnecessary, but treated it as a motion to reconsider pursuant to Rule 54(b) of the Rules of the United States Court of Federal Claims ("RCFC").   After the parties' briefing, the Court again ruled in favor of the government:

> The issue before the Court is straightforward: whether the United States Court of Federal Claims can grant preliminary injunctive relief where Plaintiff asserts only a [CDA] claim pursuant to 28 U.S.C. § 1491(a).   The Court once again answers that question in the negative — and it is not a close call.

157 Fed. Cl. at 45.

On November 24, 2021, the government filed a partial motion to dismiss Count IV of Sergent's amended complaint for lack of jurisdiction pursuant to RCFC 12(b)(1).   ECF No. 23.   Count IV sought a declaratory judgment, "finding that the VA did fail to comply with applicable OSHA regulations," but did not request any monetary relief.   Compl. ¶ 6. The Court granted the motion to dismiss, as the Court does not have jurisdiction over non-money mandating claims that the government violated OSHA regulations and has no reason to grant a declaratory judgment given that the parties' dispute is solely monetary (and does not concern continued performance under the contract).   *Sergent's Mech. Sys., Inc. v. United States*, 2022 WL 1123015, at *4 (Fed. Cl. Apr. 14, 2022).   The Court acknowledged, however, that the factual allegations regarding OSHA regulations contained in the dismissed count could potentially support the other counts (*i.e.*, seeking a monetary recovery or to excuse default).   *Id.* at *3, *5.

Following discovery, on January 16, 2024, both parties cross-moved for summary judgment as to Counts I, II, and III.   On February 13, 2024, the government filed its response brief, ECF No. 56, and Sergent filed its response-and-reply, ECF No. 57 ("Pl.

---

invoke this Court's bid protest jurisdiction pursuant to 28 U.S.C. § 1491(b)." *Sergent's Mech. Sys.*, 155 Fed. Cl. at 147.

Resp."). Finally, on February 27, 2024, the parties filed their reply briefs. ECF No. 59 ("Def. Repl."); ECF No. 60 ("Pl. Repl."). The Court held oral argument on the motions on June 10, 2024 ("Tr.").

## III.    Jurisdiction and Standards of Review

### A.  Jurisdiction

The Tucker Act provides that "[t]he Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under . . . the [CDA], including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act." 28 U.S.C. § 1491(a)(2). Accordingly, Sergent's claims are governed by the CDA.[10] The government does not contest this Court's jurisdiction to hear Sergent's claims.[11]

### B.  CDA

An action brought in this Court pursuant to the CDA "shall proceed de novo." 41 U.S.C. § 7104(b)(4). With the Court engaged in its own assessment of the facts and legal determinations, "once an action is brought following a contracting officer's decision, the parties start in court or before the [Court] with a clean slate." *Wilner v. United States*, 24 F.3d 1397, 1401-02 (Fed. Cir. 1994) (en banc) (citations omitted); *Dep't of Transportation v. Eagle Peak Rock & Paving, Inc.*, 69 F.4th 1367, 1375 (Fed. Cir. 2023) (noting the CDA's express provision "that if a contractor challenges that decision in the Court of Federal Claims . . . the action 'shall proceed de novo' under the court's rules.") (quoting 41 U.S.C. § 7104(b)(4)).

### C.  Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. RCFC 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." *Id.* at 250. "When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving reasonable inferences against the party

---

[10] Pub. L. No. 95-563, 92 Stat. 2383 (1978) (codified at 41 U.S.C. §§ 7101–7109).

[11] As noted *supra*, the Court dismissed Count IV for lack of jurisdiction on April 14, 2022. ECF No. 29.

whose motion is under consideration." *Silver State Land LLC v. United States*, 155 Fed. Cl. 209, 212 (2021) (quoting *First Commerce Corp. v. United States*, 335 F.3d 1373, 1379 (Fed. Cir. 2003)); *see also Lippmann v. United States*, 127 Fed. Cl. 238, 244 (2016) ("The [RCFC 56] standard also applies when the Court considers cross-motions for summary judgment.").

D.   Termination for Default

"When a contractor challenges a default termination, the government bears the burden of establishing the validity of the termination." *Emiabata v. United States*, 792 F. App'x 931, 937 (Fed. Cir. 2019); *see also Johnson Mgmt. Grp. CFC, Inc. v. Martinez*, 308 F.3d 1245, 1249 (Fed. Cir. 2002) ("The government bears the burden of proof in establishing the validity of a default termination."); *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987) ("[T]he government should bear the burden of proof with respect to the issue of whether termination for default was justified[.]").

"Once default has been proven, the contractor bears the burden of establishing that the default was excused by fault of the government." *Emiabata*, 792 F. App'x at 937; *see also McDonnell Douglas Corp. v. United States*, 567 F.3d 1340, 1353 (Fed. Cir. 2009) (holding that once "the government has satisfied its burden to justify the default termination . . . the contractors have the burden of going forward to prove either that they were making progress such that timely completion of the contract was not endangered or that there was excusable delay") *vacated on other grounds by Gen. Dynamics Corp. v. United States*, 563 U.S. 478 (2011).

"Failure to meet contract specifications and inability to meet the contract delivery schedule are of course relevant considerations to whether a contractor is in default." *McDonnell Douglas Corp*, 182 F.3d at 1328; *see also id.* at 1016 (holding that government is allowed to terminate contracts for default when it reasonably believes that there is no reasonable likelihood the contractor can perform the entire project in the allotted time); *Discount Co. v. United States,* 213 Ct. Cl. 567, 554 F.2d 435, 441 (1977) (inability to meet specifications); *Universal Fiberglass Corp. v. United States*, 210 Ct. Cl. 206, 537 F.2d 393, 398 (1976) (failure to meet schedule); *Aptus Co. v. United States*, 61 Fed. Cl. 638, 660-61 (2004) (failure to reassure government of timely performance after notice to show cause, resulting in termination for default), *aff'd sub nom. Lin v. United States*, 159 F. App'x 186 (Fed. Cir. 2005).   Moreover, there is "a requirement that the contractor give reasonable assurances of performance in response to a validly issued cure notice." *Danzig v. AEC Corp.*, 224 F.3d 1333, 1337-38 (Fed. Cir. 2000); *see generally* John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 929–35 (3d ed. 1995) (discussing default termination based on failure to make progress); *id.* at 953–60 (discussing anticipatory repudiation by a contractor, such as "nonperformance and claims for payments or relief from matters as to which the contractor had assumed the risk").

In this case, neither party argues that there are material disputes of fact. The question whether the government's termination of Sergent for default was proper or whether the underlying default was excused thus reduces to a question of law and is properly adjudicated at this stage. RCFC 56.

IV.    **Discussion: The Government is Entitled to Summary Judgment on all Counts**

A.  Count I: Sergent's Delay was Not Excusable

Sergent's motion for summary judgment fundamentally rests on its contention that its termination for default was improper. While Sergent at first styled its argument as one challenging the "nexus between the government's decision to terminate for default and the contractor's performance," Sergent MSJ at 20 (quoting *Bowles v. United States*, 144 Fed. Cl. 240, 252 (2019)), it is better understood as an argument that Sergent's untimely performance was excused due to government actions. *See id.* at 22 ("Both reasons [for termination for default] are improper as they are not connected to Sergent's performance under the Contract *but are instead related to the VA's own failures and imposition of extra-contractual restrictions*[.]" (emphasis added)); *see also* Tr. 4:20-25 ("THE COURT: Okay. So it really comes down to whether or not the delay that's reflected on the contract schedule is excusable, right, because otherwise it's either a repudiation or anticipatory breach or something like that. [Sergent's Counsel]: That's correct."). Moreover, there is no dispute that the schedules Sergent submitted after the cure notice only indicated completion dates after the contractual completion date. *See* Tr. 4:17-19 (Sergent's counsel agreeing that the schedules it submitted "reflect[ed] the conclusion date that was after the contract deadline"); Pl. MSJ at 23-24 (Sergent discussing its work schedules "accounting for government-caused project delays"); Def. MSJ at 13.

Indeed, both parties agreed that "this comes down to whether or not Plaintiff can show that there was excusable delay." Tr. 5:19-20; *see also* Tr. 4:20-25, 5:21. The Court therefore concludes that "the government has met [its] burden of proving that timely performance is beyond [Sergent's] reach," and thus that Sergent "has the burden of going forward to prove … that there was excusable delay." *McDonnell Douglas*, 567 F.3d at 1353.

To meet that burden, Sergent offers several explanations in arguing that its delays were excusable. First, Sergent asserts that its failure to install cooling coils in a timely fashion was due to the government's failure to "determine the presence of, quantify, or locate ACM within the relevant work areas" as required by the contract. Pl. MSJ at 24-28. Notably, Sergent concedes that only the asbestos argument could account for the full extent of its delay that, as reflected in the schedule, prompted the government to terminate the contract for default. Tr. 7:24-8:1 ("We concede that if we can't establish the delay related to asbestos that the other claims of delay would not add up to 114 days."). Therefore, to prevail on Count I, the government must show only that Sergent is wrong about the asbestos issue. Tr. 40:12-13 (Sergent's counsel confirming that "excusable

delay, the whole thing, turns on the asbestos" issue).  Second, Sergent maintains that at least some part of the delay was attributable to contradictions in the government-provided contract drawings and specifications related to the cooling coils.  Pl. MSJ at 28-32.  Third, Sergent argues that the government improperly imposed restrictions on ACU outages beyond those allowed by the contract, thus impeding Sergent from completing work that required longer and/or more frequent ACU outages.  *Id.* at 32-33.  Because Sergent lacked contractual discretion to schedule ACU outages for whenever it wished, Sergent blames the government for Sergent's delayed performance.  The Court rejects each of these arguments.

### 1. Sergent was responsible for abating asbestos

Under the terms of the contract, the VA had two primary responsibilities with regard to asbestos: (1) to "[n]otify occupants adjacent to regulated areas of project dates and requirements for relocation"; and (2) to submit to Sergent results of various tests, samplings, and analyses.[12]  Pl. App'x at 651.  But Sergent, *not the VA*, was required to abate the asbestos, among many other contractual responsibilities.  *Id.* at 649.  Sergent admits that the written terms of the contract, executed in August 2020, gave Sergent such responsibility, but argues that the VA "***became*** the abatement contractor *as early as* December 2020" for a contract executed in August 2020.  Pl. Repl. at 5 (emphasis added).  As that quotation implies, Sergent posits that although it originally had contractual responsibility for locating and clearing asbestos, that obligation somehow transferred *back* to the VA during Sergent's contract performance.  Moreover, "as early as" suggests Sergent doesn't know exactly when that transfer of responsibility occurred, a lack of specificity that undercuts Sergent's contention.  Indeed, Sergent's argument fails for the very simple reason that there is no evidence to support it.  Sergent does not point to any contract modification or other legal basis supporting a transfer of contractual duties back to the government.  Moreover, the government cannot be the "abatement contractor" to itself; that is simply a nonsensical assertion.

Sergent's arguments become more convoluted from there.  One version of Sergent's position is that the contract incorporated 29 C.F.R. § 1926.1101, an OSHA regulation which allocates responsibility for identifying specific locations and quantities of asbestos to building-owners rather than contractors.  Sergent asserts that the regulation in turn "prohibited Sergent from commencing work in the Bay Pines Facility until all asbestos was quantified and located."  Pl. Repl. at 4 (citing 9 C.F.R. § 1926.1101(k)(2)(i)).  Sergent also contends that the VA could not fully offload its asbestos-related OSHA obligations by contract "because (1) there is no provision within 29 C.F.R. § 1926.1101 that

---

[12] This section included the disclaimer that "information" submitted to the contractor, Sergent, under this clause "shall not release the Contractor from any responsibility for OSHA compliance."  Pl. App'x at 651.

permits a building owner to contractually absolve itself of its asbestos-related responsibilities and (2) contract language that a contractor 'shall satisfy' himself as to the actual quantities of asbestos necessary to abate is not, and cannot be, read as a contractual assignment of responsibility."  Pl. MSJ at 27; *see also* Tr. 11:17-24.  Sergent cites no authority for these assertions, and they are critically undermined by Sergent's admission that the VA *can* delegate responsibility for dealing with asbestos as long as the government "clearly disclaim[s]" responsibility.  Tr. at 11:2.

While the government does not marshal specific affirmative support for the commonsense proposition that it may, via contract, assign asbestos-related obligations to a contractor, the government *does* point to other regulations incorporated by reference that buttress its position.  For example, the contract incorporates FAR 52.236-7, requiring Sergent to "comply[] with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work."  Pl. App'x at 41.  Furthermore, the contract, in its introduction to asbestos-abatement responsibilities, requires that "[t]he *Contractor* shall satisfy himself as to the actual quantities to be abated," the necessary implication of which is that Sergent bore the responsibility for assessing and abating asbestos.  *Id*. at 639 (emphasis added).

Sergent's attempt to wriggle out of the plain meaning of the contract amounts to little more than conclusory statements unsupported by law.  Sergent cites no source of law providing that the VA is restricted from contracting out its asbestos-related OSHA obligations.  Indeed, the most natural understanding of any OSHA rule (*e.g.,* 29 C.F.R. § 1926.1101) making a building-owner responsible for identifying the location and amount of asbestos is that the rule addresses who has the responsibility for ensuring the remediation, not for actually performing the remediation.  The absurdity of Sergent's interpretation of 29 C.F.R. § 1926, which would prohibit building owners from hiring a remediation contractor, is confirmed by Sergent's admission that "individual VA employees" need not "go out, test -- sample, test, and identify asbestos."  Tr. 11:3-5.  The obvious meaning of the regulation is that while a building-owner is responsible under the law for addressing the asbestos, it may do so by hiring a contractor.  For Sergent to be correct, in contrast, every building owner with an asbestos problem must itself have expertise in asbestos remediation.  That cannot be correct and, indeed, Sergent provides no authority for such a rule.  Absent clear (or, in this case, *any*) legal authority to the contrary, the Court concludes that the VA may contract away the responsibility for addressing the asbestos in its buildings and, having done so here, terminate Sergent for default for failing to fulfill its contractual asbestos remediation duties.

Sergent also advances the incompatible narrative that the VA, in verbal discussions, somehow either *took on the contractual responsibility* of asbestos abatement that Sergent originally had, or somehow led Sergent to believe that the VA would assist Sergent with asbestos abatement.  Pl. Repl. at 5 (arguing that the VA "became the abatement contractor as early as December 2020, when it declined Sergent's offer to abate

the additional asbestos identified in the December 8, 2020 asbestos report . . . and subsequently agreed to abate asbestos itself"); *see also* Tr. 19:16-24 (Sergent's counsel asserting, without support, that Sergent was "led to believe that [it] would not have to meet this deadline because [the VA was] handling it. They stepped in and they said we'll take care of this part of the work and relieve you of it."). But this argument is fundamentally inconsistent with Sergent's position that the government could not relinquish such responsibility to begin with. *See* Pl. MSJ at 24.

Moreover, for Sergent to argue that it transferred some or all of its asbestos-related obligations *back* to the government, Sergent would have to provide evidence of a written modification to that contract, including consideration. *See* FAR 2.101 ("*Contract* means a mutually binding legal relationship obligating the seller to furnish the supplies or services (including construction) and the buyer to pay for them. It includes all types of commitments that obligate the Government to an expenditure of appropriated funds and that, except as otherwise authorized, are *in writing* . . . contracts include . . . bilateral contract modifications." (emphasis added)); *Alaska Am. Lumber Co. v. United States*, 25 Cl. Ct. 518, 532 (1992) ("In order to be enforceable, however, every modification to a contract must be supported by consideration."); *Keeter Trading Co. v. United States*, 85 Fed. Cl. 613, 629 (2009) ("Numerous decisions of this court's predecessor, the United States Court of Claims, have echoed the above principle — that a contract modification must be supported by consideration. A lack of consideration will render the contract modification void, or without force or effect.").[13]

Where, then, is the evidence of a modification to the contract, including consideration? *See Mil-Spec Contractors, Inc. v. United States*, 835 F.2d 865, 867 (Fed. Cir. 1987) ("Unless and until there was a binding modification to which both Mil–Spec and the contracting officer had agreed in writing, there could not be a binding modification of the contract."). It does not exist. Sergent's only evidence supporting the notion that something changed the parties' responsibilities is Sergent's own notes from a January 14, 2021, meeting showing that its representatives believed the "VA will abate all remaining asbestos pipe insulation." Pl. App'x at 1649. Sergent provides no evidence of any written modification or any details regarding the rest of the modified contract, or any indication that the parties achieved a meeting of the minds to modify the written contract so as to shift asbestos-related responsibilities to the government or to otherwise relieve Sergent of any contractual obligations. The Court can only conclude, as a matter of law, that no

---

[13] Sergent cannot rely upon its existing contractual duties as constituting consideration. *See Gardiner, Kamya & Assocs., P.C. v. Jackson*, 369 F.3d 1318, 1322 (Fed. Cir. 2004) ("Performance of a pre-existing legal duty is not consideration.") (citing Restatement (Second) of Contracts § 73 (1981)); *see also* 17A Am. Jur. 2d Contracts § 147 (agreeing to do work that is already done, *i.e.* "past consideration," is not consideration). Sergent also does not point to any additional work it took on as part of the putative modification, nor does Sergent argue that the government received some tangible financial benefit.

such modification exists.  *See First Crystal Park Assocs. Ltd. P'ship v. United States*, 130 Fed. Cl. 260, 272 (2017) (government contractor's failing to show "evidence that a contracting officer (or any other official with contracting authority) had knowledge of any subsequent lease modification or new lease[,]" led the Court to conclude that the parties "never entered an enforceable agreement to modify the existing lease or enter a new lease").  The government's oral statement simply does not suffice.  *See Bullock v. United States*, 10 F.4th 1317, 1323 (Fed. Cir. 2021) ("[I]n the government procurement contract context, where a preexisting written contract is governed by regulations that require a writing to modify the agreement, oral modifications in the form of contract dispute settlements are unenforceable[.]"); FAR 2.101 (requiring that a bilateral contract modification be "in writing").

Nor does Sergent provide evidence plausibly supporting a theory of estoppel, even assuming the government could be bound by a VA representative's assuring Sergent that, notwithstanding the written contract, the VA would abate all asbestos.  To be clear, this is not a theory Sergent even advances.  But even if it had, there is no record evidence before the Court demonstrating that someone from the VA, with actual authority to make a promise altering contractual obligations, did so.  *See American Electric Laboratories, Inc. v. United States*, 774 F.2d 1110, 1113 (Fed. Cir. 1985).  Sergent has not established that any of the individuals with whom it discussed asbestos-abatement "had actual or implied authority to agree to modify the contract" nor did Sergent "tender genuine issues of material fact that would, as a matter of law, support that conclusion." *P & K Contracting, Inc. v. United States*, 108 Fed. Cl. 380, 390 (2012), *aff'd*, 534 F. App'x 1000 (Fed. Cir. 2013); *see also Winter v. Cath–dr/Balti Joint Venture*, 497 F.3d 1339, 1344 (Fed. Cir. 2007) ("Where a party contracts with the government, apparent authority of the government's agent to modify the contract is not sufficient[;] an agent must have actual authority to bind the government.").  Altogether, there is not the slightest indication that *anyone* from the VA promised a change in the allocation of asbestos-abatement responsibility or believed they were providing such relief to Sergent.

Sergent also does not offer any cogent legal argument to make sense of its assertion that the VA somehow "***became*** the abatement contractor" well before the January 14, 2021, meeting, when the VA allegedly "declined Sergent's offer to abate the additional asbestos identified in the December 8, 2020, asbestos report . . . and subsequently agreed to abate asbestos itself."  Pl. Repl. at 5 (emphasis added).  Sergent, as the "party alleging the existence of a contract[,] has the burden of demonstrating 'a mutual intent to contract including an offer, an acceptance, and consideration.'" *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1434 (Fed. Cir. 1998) (quoting *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed. Cir. 1997)).  But Sergent does not explain, and the Court is left unsure, when or by what legal mechanism the government "became" a contractor.

Again, there is simply no evidence that the VA agreed to assume any of Sergent's contractual duties.  The fact that the VA may have stepped in, to some extent, to help

Sergent complete its work that was behind schedule, Pl. App'x at 1472, does not absolve Sergent of its contractual responsibilities, nor does it create a new contract between the VA and itself.  Having offered no evidence that the parties effected a change to the original contract — or even a legal theory explaining how the government's behavior could plausibly amount to such a change — Sergent effectively asks the Court to reinterpret the contract in light of a bare assertion.  The Court rejects Sergent's attempt to avoid its contractual obligations by positing the existence of a phantom modification.

To the contrary, as the government correctly argues, if Sergent thought the VA was not upholding its end of the bargain under the contract, Sergent could have "conduct[ed] any required testing itself; perform[ed] any abatement that needed to be done, based on the results of the testing; and submit[ed] a claim to VA for any work that exceeded the contract's requirements."  Def. Repl. at 6 (citing FAR 52.233-1).  Instead, Sergent chose to wait, failed to make progress, blew the contractual deadline, was terminated for default, and then filed a CDA claim and sued.  But that is precisely what a contractor may *not* do.  A government contractor cannot disregard the government's directives under the FAR's changes and disputes clauses and then fail to make progress on the required work.  That rule was settled long ago.  *See Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1266 (Fed. Cir. 1999) ("Holding that the court may address [a plaintiff's] challenge to the contracting officer's order to perform the option does not free [the plaintiff] from its obligation under the disputes clause to perform the option as directed pending a favorable decision from the court.  That obligation continues.").

In sum, Sergent has not proved that Section 1.5.2 of the Asbestos Abatement Agreement is inoperative.  Again, that section provides that "[t]he Asbestos Abatement Contractor" — which is Sergent[14] — "shall assume full responsibility and liability for compliance with all applicable . . . regulations related to any and all aspects of the asbestos abatement project."  Pl. App'x at 649.  And because Sergent has not shown that its failure to remediate asbestos in a timely fashion was excused or excusable, Sergent cannot prevail on its asbestos argument generally.  Rather, Sergent is responsible for the full extent of its delay, and consequently for failing to respond adequately to the VA's demands for assurances that the work would be completed on time.  *See Danzig*, 224 F.3d at 1337-38 ("[A]nticipatory repudiation includes cases in which reasonable grounds support the obligee's belief that the obligor will breach the contract.  In that setting, the obligee 'may demand adequate assurance of due performance' and if the obligor does not give such assurances, the obligee may treat the failure to do so as a repudiation of the contract." (quoting *Restatement (Second) of Contracts* § 251 (1981))).  Sergent's responses to the cure notice and show cause order "affirmatively asserted" that Sergent "could not complete the project without additional time," amounting to an "anticipatory repudiation" that "alone provides sufficient justification for termination of the contract."

---

[14] The government does not refer to itself as a contractor.  FAR 2.101.

*Hubsch Industrieanlagen Spezialbau, GmbH v. United States*, 116 F.3d 1497 at *4 (Fed. Cir. 1997).  Sergent cannot prevail on its theory of excusable delay, and accordingly fails in its challenge to the government's default termination.

Though this analysis suffices to dispose of Count I entirely in the government's favor, the Court nevertheless addresses Sergent's other allegations within that count.

2.  Sergent is responsible for delays relating to cooling coils

Sergent alleges that "[d]elays related to . . . the VA's demand for larger capacity cooling coils than what was called for in the Contract specifications" are "attributable to the VA," and that therefore Sergent's default should be excused.  Compl. ¶ 103.  More specifically, Sergent argues that the contract contained "inherently contradictory information" regarding the cooling coil dimensions and tube-diameter measurements, as some specifications appeared to require half-inch tube diameters while others explicitly required 5/8-inch diameters.  Pl. MSJ at 29.  Sergent maintains that the alleged discrepancy was responsible for Sergent's performance delays.  Pl. MSJ at 30 ("Thus, a 32-day Contract delay resulted due to the above-described information within the Drawings and Specifications.").

As an initial matter, Sergent misinterprets the contract's provisions governing cooling coils, much as the VA contracting officer described in his denial of Sergent's REA.  Pl. App'x at 1455.  The contract's plain language required Sergent to "measure existing cooling coils in existing air handling units and provide replacement coils with the scheduled performance and specified construction," and further directed Sergent to "Section 23 82 16" which contained the 5/8-inch diameter requirements.  *Id.* at 885-86.  Sergent seems to have confused the requirement to *measure* existing coils and provide replacements of different specifications with a requirement to provide replacements that *replicate* the existing coils.  But nowhere does the contract direct Sergent to replicate the existing coils.

Though Sergent repeatedly pointed to "Section 23 73 00" as a source of conflicting information, *see* Pl. App'x at 1074, 1083, 1092-93; Pl. MSJ at 29-31, that contract specification section does not provide any specific diameter for cooling coils.  Pl. App'x at 885-87.  Its only direction arguably specifying a diameter requirement is its instruction that Sergent should: (1) "[r]efer to Drawings and Section 23 82 16, AIR COILS for additional coil requirements"; and (2) review "Section 23 82 16, AIR COILS: Heating and cooling coils and pressure requirements."  *Id.* at 885-86.  And, fatally for Sergent, Section 23 82 16 clearly specifies cooling-coil tubes of 5/8-inch diameter.  *Id.* at 1056 ("Tubes: Minimum 16 mm (0.625 inch) tube diameter[.]").

After a clear section break, Pl. App'x at 887 ("- - - END - -" followed by a page break), the contract *did* include an addendum of data sheets from more than a decade

19

ago. Some of those data sheets did reflect half-inch diameter tubes. *See id.* at 963-1053. But they are for informational purposes only (*i.e.*, regarding existing conditions); they do not contain any instructions directing Sergent to use those measurements in performing the contract.[15]

The Court disagrees with Sergent's contention that there is a latent ambiguity in the contract because the operative language with the 5/8-inch requirement is "a hard thing to find. It's a needle in a haystack." Tr. 26:6-7. Section 23 73 00, which deals with air-handling units, is a little longer than two pages, and matches the other contract sections in layout and style, with a clear beginning and clear end. Given that it twice directs Sergent's attention to specification Section 23 82 16, it is hardly ambiguous in its requirements.

As a secondary matter, Sergent's factual allegations do not provide a viable theory of excusable delay. Sergent asserts in its complaint that "[r]esolution of the cooling coil tube size discrepancy delayed Sergent's performance under the Contract by 32 days." Compl. ¶ 36. Even if Sergent could show that the contract was, in fact, "erroneous, meaning that Sergent was left to choose . . . which information applied during its bidding and initial procurement decisions," Pl. MSJ at 30, Sergent does not explain why this led to delay rather than mere increased costs. Sergent's REA, Pl. App'x at 1090-96, indicates that Sergent faced additional costs after procuring two sets of tubes and coils when it expected to procure only one. But if this Court is going to conclude, as Sergent urges, that there was also a "32-day delay stemming from the cooling coil capacity and tubing size issue," *id.* at 32, Sergent needs some inkling of a causal theory to go on. How did these issues cause or at least contribute to delays? Even now, at the summary judgment stage, Sergent has yet to provide an explanation of how its confusion over its precise contractual responsibilities regarding the cooling coils (even if it were justifiable confusion) gave rise to not just increased cost but extended time needed to complete the contract.

Even if the Court conjured an explanation on Sergent's behalf, Sergent has provided no evidence that would connect the problem to a 32-day delay. Failing to provide evidence to support an essential element of a claim is fatal at the summary judgment stage. *See Celotex*, 477 U.S. at 325 (explaining that "the burden on the moving party may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case") (internal quotations omitted); *see also Exigent Tech., Inc. v. Atrana Sols., Inc.*, 442 F.3d 1301, 1308 (Fed. Cir. 2006) (upholding district court's grant of summary judgment for Atrana based on Exigent's admission that it had offered no

---

[15] Section 23 73 00 contained instructions to measure existing units and repair them; the data-sheets addendum provided significant additional information about those existing units to aid in those processes.

relevant evidence as part of the summary judgment record); *Demodulation, Inc. v. United States*, 118 Fed. Cl. 69, 74 (2014) ("However, where the nonmovant bears the burden of proof at trial, the movant can satisfy its burden at the summary judgment stage by identifying an absence of evidence supporting an essential element of the nonmovant's case." (citing *Celotex*, 477 U.S. at 322-23)).

Moreover, even to the extent that the Court is willing to infer that *some* delay is inherent in a confused back-and-forth between the parties, Sergent has not provided any critical path method ("CPM") analysis.  *See Blinderman Const. Co. v. United States*, 39 Fed. Cl. 529, 585 (1997), *aff'd*, 178 F.3d 1307 (Fed. Cir. 1998) (explaining that "the only way to accurately assess the effect of the delays alleged . . . is to contrast updated CPM schedules prepared *immediately* before and *immediately* after each purported delay").  Absent *any* analysis of how specific events resulted in specific delays according to reliable methodology — let alone a CPM analysis — this Court cannot credit Sergent's bare assertion that its confusion over coils and tubes resulted in anything more than negligible hassle that Sergent could have overcome all along, albeit, perhaps, at increased cost.  As the Federal Circuit has explained, "[t]he required nexus between the government delay and a contractor's failure to complete performance at some unspecified earlier date cannot be shown merely by hypothetical, after-the-fact projection."  *Interstate Gen. Gov't Contractors, Inc. v. West*, 12 F.3d 1053, 1060 (Fed. Cir. 1993).

Altogether, Sergent cannot rely on the cooling-coil issue to account for its delay and thereby excuse its default.

3.  The contract permitted the VA to impose limitations on ACU outages

Sergent alleges that the VA's "limitation on the duration and number of utility outages caused delays to Sergent's Contract performance," Compl. ¶ 47, but Sergent neither provides a CPM analysis nor makes  any attempt to quantify that delay or a  to connect all the dots in its case.  Sergent concedes, however, that delays related to ACU outages are subsumed within the asbestos-remediation issue and thus does not provide an independent source of excusable delay sufficient to negate Sergent's default.  Tr. 39:23-24 (Sergent's counsel reiterating that "if the asbestos remediation is found against us that nothing else will cover it").

Even putting that fatal flaw in its position aside, Sergent's argument flounders further on the merits.  The contract required Sergent to have a plan in advance of performing the work that would account for the kinds of challenges the parties expected to be present at a VA hospital, and gave Sergent significant responsibility to deal with those obstacles. Specifically, among other obligations, Sergent had to:

> [p]rovide temporary facilities, labor, materials, equipment, connections, and utilities to assure uninterrupted services.

> Where necessary to cut existing water, steam, gases, sewer or
> air pipes, or conduits, wires, cables, etc. of utility services or
> of fire protection systems and communications systems
> (including telephone), they shall be cut and capped at suitable
> places where shown; or, in absence of such indication, where
> directed by [the contracting office representative].

Pl. App'x at 503.  The VA, however, maintained significant discretion to direct Sergent's work plans in various ways.  For example, the contract provided that "[n]o utility service such as water, gas, steam, sewers or electricity, or fire protection systems and communications systems may be interrupted without prior approval of [the contracting officer's representative]."  *Id.*

Notwithstanding those contractual provisions, Sergent argues that the VA's "unilateral imposition of a time restriction on ACU outages four months into Sergent's cooling coil performance window delayed Sergent's progress under the Contract." Pl. MSJ at 33.  Slightly more specifically, Sergent contends that "the VA made that decision on its own and in full awareness of its delaying effect on the Contract," while "the Contract placed no time-based restrictions on ACU outages," and therefore "the VA must bear responsibility for those delays."  *Id.* at 32-33.

Sergent provides no legal authority for the proposition that a contractually authorized restriction "unilaterally developed and implemented" that turns out to delay the completion of the work is a per se excuse for Sergent's failure to meet contractual deadlines.  Pl. MSJ at 32.  Sergent does not even lay out the legal doctrine it believes should control the issue.  Instead, Sergent relies on an unstated premise that the contract did not contemplate the possibility of the VA placing limitations on ACU outages, or that to the extent the contract contemplates ACU outages, the contract prevented the VA from imposing outage limitations.

The government counters that the contract language clearly "contemplated that VA would impose restrictions on outages and retained discretion to deny requests to proceed at Sergent's preferred times."  Def. MSJ at 33 (citing the above contract language, among other provisions).  According to the government, the contract does indeed impose some onerous conditions on Sergent, but Sergent "made a choice when it submitted its proposal to proceed notwithstanding the risk they might [in]cur—and especially when it marketed its ability to navigate this fundamental difficulty in the project, and ensured in its bid that it would be compensated for this difficulty."  *Id.* at 34.  In other words, Sergent assumed the risk of delays due to outage limitations and the like, and presumably accounted for it in its proposed price.

The Court finds that the contract's allocation of ample discretion to the VA to approve ACU outages includes by implication the discretion to impose restraints on ACU

outages. Thus, the contract put the risk of outage limitations on Sergent, which knew that the VA had wide discretion to reject its ACU-outage proposals. The contractor was required, among other things: to coordinate interruptions in service with the contracting office, Pl. App'x at 503; to maintain services at all times, uninterrupted, through temporary operations nearly regardless of the circumstances, *id.* at 504; and, crucially, to seek permission from the VA to execute its interruptions to a variety of HVAC services, *id* at 503-04. The VA, meanwhile, clearly had significant discretion to decide how interruptions would occur so as to cause "least inconvenience to [the] operations of [the] Medical Center." *Id.* The entire section of the contract that forms the basis of this dispute allocates sweeping responsibility to Sergent and sweeping discretion to the VA. *See id.* at 497-515 (listing dozens of Sergent's responsibilities and instances in which Sergent must defer to the VA or abide by VA's instructions). In general, Sergent was required to "[e]xecute work so as to interfere as little as possible with normal functioning of [the] Medical Center as a whole." *Id.* at 501. If the VA determined that that was best accomplished by telling Sergent in advance that it would reject ACU-outage proposals of certain lengths or frequencies, that was well within the VA's power pursuant to the contract.

The Court concludes that these provisions support the government's reading of the contract. They cannot serve as a basis for excusing Sergent's delay, and again, are immaterial in light of the asbestos issue the Court resolved above.

### B. Count II: The Government Fully Compensated Sergent for the Work Completed

Sergent claims nonpayment of invoices totaling $533,154.78. Compl. ¶ 110.

Undisputed in the record is that the VA had already paid Sergent $462,410.68 for work completed under this contract. Compl. ¶ 88. Accordingly, and given this Court's granting summary judgment for the government on Count I, Sergent, as the breaching party, would be responsible for putting the government in the same financial position it would have been in had Sergent properly performed the contract. *See S. California Fed. Sav. & Loan Ass'n. v. United States*, 422 F.3d 1319, 1332 (Fed. Cir. 2005) ("The purpose of damages for breach of contract is generally to put the wronged party in as good a position as he would have been had the contract been fully performed."); *see also Restatement (Second) of Contracts* § 344 (1981); Tr. 30:19-25 (government's counsel explaining "the essential idea" of damages calculation: "the contractor has to pitch in the extra [money] . . . to make up the difference between what the actual cost is and what the cost should have been"); Tr. 32:22 (Sergent's counsel agreeing that that framework applies here). Sergent and the VA had a contract for $3,889,875.46, so Sergent is liable for any excess costs to complete the contract. *See* Pl. App'x at 4, 1752-53 (surety's discussion of this issue).

The government succinctly summarizes the role performance bonds played in this case:

> Sergent's bid included bonds, underwritten by Berkley, pursuant to which Berkley agreed to complete performance if the contract was terminated for default. Berkley discharged this obligation by entering into a tender agreement with VA and the completion contractor VDC. The tender agreement provides for the contract balance, as of the date Sergent was terminated, to be paid to VDC upon satisfactory completion of the work required by the tender agreement. Though the surety must front the costs of completing the contract, Sergent is ultimately responsible for those costs. Pursuant to the performance bond, Sergent is liable to Berkley for the costs that the surety was required to incur to complete the contract. Berkley's costs, in turn, reflect the difference between the cost of VDC completing performance and the amount of the contract balance at the time of contract termination, which offsets the cost of completing performance. Accordingly, when VA agreed to pay the contract balance to VDC upon completion of the project, Sergent effectively received a credit against Sergent's debt to the surety.

Def. MSJ at 37-38 (internal citations omitted). Sergent does not dispute that this arrangement existed. *See* Tr. 37:8-38:1 (clarifying that Sergent's only argument concerns "the value that Sergent received").

Berkley provided assurance and security that the contractor will perform as promised. As explained at oral argument: "Instead of using the contract balance to pay Sergent, once the contract was terminated, a surety then gets rights to the contract balance. And the contract balance . . . instead went into the completion contract." Tr. 28:1-8 (government counsel explaining basic arrangement). The contract balance (the contract value, minus the already-paid invoices) is therefore $3,427,464.78. Pl. App'x 1752-55.

The parties do not dispute, and the record demonstrates, that the projected cost to complete the contract with a new contractor was $6,237,953.00. Pl. App'x at 1755. Sergent, which was ultimately responsible for the costs of completing the contract, had to post a bond with Berkley for $2,810,000, the estimated difference between the roughly $6.2 million to complete the contract and the roughly $3.4 million contract balance. *Id.*

The VA entered into a tender agreement with Berkley to pay the contract balance of $3,427,464.78, Pl. App'x at 1758-72, effectively giving Sergent a credit of $3,427,464.78

in their future $6,237,953 payment to the surety.  It is undisputed that this credit includes the invoices in question that the VA did not pay to Sergent.  Tr. 36:13-17 ("THE COURT: does that [$]3.4 [million] contract balance include the invoices that weren't paid or not? [Government's counsel]:  So the invoices were not paid.  If the invoices had been paid, the contract balance would have been reduced commensurately.").

If the court were to grant Sergent's motion and enter judgment for the VA to pay Sergent $533,154.78, Sergent would enjoy a double recovery, in the form of the credit it already received plus this "cash" judgment.  That would yield an impermissible double recovery. *See Crooker v. United States*, 828 F.3d 1357, 1363 (Fed. Cir. 2016) (citing *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002)).

Sergent argues that summary judgment for the VA should be denied because "Defendant has not proven that Sergent benefitted from payments made to [the third-party completion contractor]."  Pl. Resp. at 27.  But the evidence demonstrates that Sergent has indeed benefitted from the VA payments made to the completion contractor (via the surety), as Sergent received a credit for all of the VA's payments.  Pl. App'x 1770. This is a clear benefit to Sergent — a credit on its bill for the completion cost.  *Id.*

Finally, as discussed at oral argument, Sergent does not attempt to rebut the contention that if the court were to rule that the contract properly was terminated for default, then ruling for Sergent on this issue would result in a double recovery. Tr. 36-38. Instead, Sergeant responded to the issue of double recovery by making the unsubstantiated and novel allegation that the $6,237,953.00 completion contract cost may not be accurate:

> [Government's Counsel:] So at the end of the day, if the ruling is the Government breached the contract by not paying these invoices, Sergent will both get credit from the surety and then will have this extra amount, you know, in damages that goes beyond what they would have gotten otherwise. . . .
>
> THE COURT:  That all makes sense to me.  What's Sergent's response to that?
>
> [Sergent's Counsel]:  I think our response, Your Honor, boils down to the value that Sergent received.  Sergent had to post a bond payment of $2.8 million.  I understand that that is based on a credit that the Government gave the surety with regards to the contract value remaining on the contract. However, it's not clear whether the follow-on contractor redid the work that Sergent did, and so is the VA enjoying the work that Sergent had already completed on the job and then

not having to pay for that work, which is what they invoiced for. And, so, at this point, the only value Sergent received as far as their obligation –

THE COURT:  That's the same as contesting that the projected cost to complete is [$]6.237 [million].

[Sergent's Counsel]:  Yes.

THE COURT:  That's the same thing as saying maybe the projected cost to complete should have been lower.

[Sergent's Counsel]:  Yes, Your Honor.

THE COURT:  Okay, and where is that in your brief?  Is that somewhere in your brief?

[Sergent's Counsel]:  That's a different argument, not in our brief, Your Honor.

THE COURT:  . . . [W]hat's the Government's response to this [$]6.237 [million], just that it's unrebutted in the record?

[Government's counsel]:  It's unrebutted in the record, yes.

Tr. 36:21-38:12.

"[A]rguments that are not appropriately developed in a party's briefing may be deemed waived*." SmartGene, Inc. v. Advanced Biological Laboratories, SA*, 555 F. App'x 950, 954 (Fed. Cir. 2014).[16]  Sergent's contention that the cost to complete the project was

---

[16] *See also Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 1379 n.2 (Fed. Cir. 2020) (noting that arguments made "in passing" are not considered fully developed and are waived), *cert. denied,* –– U.S. ––, 142 S. Ct. 82 (2021); *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1341 (Fed. Cir. 2006) (concluding that undeveloped arguments are "deemed waived"); *Olaplex, Inc. v. L'Oréal USA, Inc.*, 855 F. App'x 701, 712 (Fed. Cir. 2021) ("If the record contains more evidence than [the court] ha[s] identified, [and the parties] ha[ve] not brought such additional evidence to [the court's] attention, [the court] need not sift the extensive record for it on [its] own."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' [is] really nothing more than an assertion, [and] does not preserve a claim[,] [e]specially not when the brief presents a passel of other arguments . . . Judges are not like pigs, hunting for truffles buried in briefs." (citation omitted)); *DeJonghe v. City of Dearborn Heights*, 2021 WL 4894613, at *8 (E.D. Mich.

improperly projected at $6.237 million is waived.  The completion costs are indeed unrebutted in the record.  Accordingly, there is no legal argument here that would allow the Court to rule in Sergent's favor on this count, nor any basis to conclude that there is a factual dispute over how much the VA paid Sergent or how much, if anything, Sergent is still owed.

### C.  Count III: The VA Did Not Constructively Change the Contract

Sergent claims that the government improperly required Sergent to spend additional money out-of-pocket for which Sergent must be compensated.  First, Sergent claims it had to "purchase cooling coils with a higher cooling capacity than those contemplated in the Contract specifications," which "is a constructive change to the Contract's terms."  Compl. ¶¶ 117-18 (seeking "$88,841.29 in additional costs").  Second, Sergent alleges that the "limitation on the duration and number of utility outages . . . is a constructive change to the Contract's terms" that "caused Sergent to incur $54,043.66 in labor inefficiency costs."  *Id.* at ¶¶ 119-20.

"A constructive change occurs where a contractor performs work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the Government."  *Int'l Data Prod. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007) (citing *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 678 (1994)); *see also Aydin Corp. v. Widnall,* 61 F.3d 1571, 1577 (Fed. Cir. 1995) ("Where it requires a constructive change in a contract, the Government must fairly compensate the contractor for the costs of the change.").  "There are two basic components to the constructive change doctrine — the change component and the order/fault component."  *Conner Bros. Const. Co. v. United States*, 65 Fed. Cl. 657, 679 (2005). "The 'change' component describes work outside of the scope of the contract, while the 'order/fault' component describes the reason that the contractor performed the work."  *Id.* (citing *Miller Elevator Co.*, 30 Fed. Cl. at 678).  A government officer with the requisite authority must have directed the contractor to perform the additional work.  *Id.* (citing *Calfon Constr., Inc. v. United States,* 18 Cl. Ct. 426, 434 (1989)).

Sergent's constructive change claims fail for the same reasons as Counts I and II.  As explained *supra*, the VA did not change the contract's terms regarding the cooling coils.  To the contrary, Sergent misinterpreted the contract, and incurred additional costs to remediate its own mistakes.  As previously explained, Section 23 73 00 does not provide any specific diameter for cooling-coil tubes.  Pl. App'x at 885-87.  Instead, it directed Sergent to "[r]efer to Drawings and Section 23 82 16, AIR COILS for additional coil requirements" and to review "Section 23 82 16, AIR COILS: Heating and cooling coils

---

Oct. 20, 2021) ("Because the Court cannot develop Plaintiff's arguments *sua sponte*, Plaintiff's challenge is waived.").

and pressure requirements." *Id.* at 885-86.  Following those clear instructions would have led Sergent to see that Section 23 82 16 specifies cooling-coil tubes of 5/8-inch diameter. *Id.* at 1056 ("Tubes: Minimum 16 mm (0.625 inch) tube diameter[.]").  If Sergent had been more careful, Sergent would have avoided purchasing unnecessary replacement coils and tubes.  The government is not responsible for the cost of those replacement parts and does not have to cover the $88,841.29 in alleged additional costs.

Likewise, the VA did not change the contract's terms regarding ACU-outage restrictions.  As detailed *supra*, the contract's terms required Sergent to coordinate interruptions in service with the contracting officer, while maintaining services at all times, uninterrupted, through temporary operations nearly regardless of the circumstances.  Pl. App'x at 503 ("No utility service such as water, gas, steam, sewers or electricity, or fire protection systems and communications systems may be interrupted without prior approval of [the contracting office representative].").  The contract provided VA with the discretion to approve outages in the way the VA determined would cause the "least inconvenience to [the] operations of [the] Medical Center." *Id.* at 503-04.  Imposing ACU-outage restrictions is not a change to these terms.  Notably, Sergent makes no effort to provide the Court with any evidence that the VA exercised its discretion unreasonably or contrary to commercial norms.  Even accepting that the VA's restrictions made Sergent's work more difficult does not prove that the VA somehow violated its contract with Sergent or imposed a constructive change.  Because the Court finds that there is no evidence that the government acted inconsistently with the terms of the contract at issue, Sergent's constructive changes claims fail.

## V.    **Conclusion**

For the foregoing reasons, the Court finds that the government is not liable to Sergent.  The Court thus **DENIES** Sergent's motion for summary judgment on all three counts of its complaint and **GRANTS** the government's motion for summary judgment on the same.  The Clerk of the Court is directed to enter **JUDGMENT** for Defendant, terminating this case.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge